# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-IA-01522-SCT

*MAR-JAC POULTRY MS, LLC*

*v.*

*PATRICIA LOVE, INDIVIDUALLY, AND AS
NEXT BEST FRIEND, AND PERSONAL
REPRESENTATIVE OF KEANNIE LOVE, AND
ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF KEANNIE LOVE AND
LASHAWN MILLER, INDIVIDUALLY, AND AS
NEXT BEST FRIEND, AND PERSONAL
REPRESENTATIVE OF LISHANAY WILKS, AND
ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF LISHANAY WILKS*


| | |
|---|---|
| DATE OF JUDGMENT: | 10/12/2017 |
| TRIAL JUDGE: | HON. EDDIE H. BOWEN |
| TRIAL COURT ATTORNEYS: | CORY NATHAN FERRAEZ |
| | PAUL MANION ANDERSON |
| | RANCE N. ULMER |
| | DAVID M. OTT |
| COURT FROM WHICH APPEALED: | COVINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID M. OTT |
| | KRIS A. POWELL |
| ATTORNEYS FOR APPELLEES: | P. MANION ANDERSON |
| | SAMUEL S. McHARD |
| | RANCE N. ULMER |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND RENDERED - 06/13/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.    Mar-Jac Poultry MS, LLC (Mar-Jac), appeals the denial of its motion for summary judgment on the Plaintiffs' claims for negligence, negligence per se, and wrongful death under the theory of *respondeat superior* after a Mar-Jac employee's vehicle collided with a school bus on the way to work, killing his two passengers, who were also Mar-Jac employees. Based on the evidence presented, we find that the trial court erred in denying Mar-Jac's motion for summary judgment, for it is undisputed that the driver was not acting in the course and scope of his employment with Mar-Jac when the accident occurred. Thus, we reverse, and we render summary judgment in favor of Mar-Jac.

## FACTS AND PROCEDURAL HISTORY

¶2.    Beginning in June 2015, Senah Carter was employed at Mar-Jac as a "jack driver." He was responsible for bringing chicken in and out for the employees on the line and throwing away wet pallets and empty boxes. Carter was not assigned any other job responsibilities. In September 2015, Carter asked his supervisor, Launis Cameron, if Mar-Jac had any job openings for Lishanay Wilks, who lived in his home, and Keannie Love, who was Wilks's friend. Cameron did not have any job openings, so he told Carter to ask Leo Barnes, another Mar-Jac supervisor, if he had any openings. Barnes responded that he had two spots available and asked Carter if the two women would be able to show up for work. Carter told Barnes that he would "bring 'em to work." Barnes responded that if the women could be there the next morning, Carter could "bring them on down here," so they could start work. Carter testified that he was never told that he was expected or required by Mar-Jac to bring Love and Wilks to work.

¶3.    Carter drove Wilks and Love to work almost every day for approximately three weeks. Wilks and Love gave Carter a few dollars for gas. On September 22, 2015, Carter was driving to Mar-Jac with Wilks and Love when he drove his vehicle into the back of a school bus. Wilks and Love both were killed.

¶4.    On March 29, 2016, Patricia Love and Lawshawn Miller, on behalf of Love and Wilks, filed a complaint in Covington County Circuit Court, asserting claims for negligence, negligence per se, and wrongful death against Carter and against Mar-Jac under the theory of *respondeat superior*. Attached to the complaint was an affidavit signed by Carter, which stated that Carter believed driving Wilks and Love was part of his normal work assignment. An affidavit signed by Patricia Love also was attached, stating that Carter had told her that he provided transportation for Wilks and Love because Mar-Jac told him to do it as part of his job duties.

¶5.    The Plaintiffs then filed a combined motion and memorandum for partial summary judgment on the *respondeat superior* claims against Mar-Jac. Citing inapplicable workers' compensation cases and cases from other jurisdictions, the Plaintiffs alleged that Carter was on a "special mission" for Mar-Jac at the time of the car accident and, thus, was acting in the course and scope of his employment. The Plaintiffs attached the following to their motion: (1) the Mississippi Highway Patrol's crash reports from the car accident; (2) Carter's affidavit; (3) Carter's deposition from his workers' compensation claim; (4) Mar-Jac's answer and affirmative defenses; (5) Patricia Love's affidavit; (6) Leo Barnes's deposition; and (7) Carter's workers' compensation petition to controvert.

¶6.     On September 12, 2017, Mar-Jac filed its motion for summary judgment and a response to the Plaintiffs' motion for partial summary judgment, arguing that Carter was not acting within the course and scope of his employment with Mar-Jac at the time of the car accident and that Mar-Jac was not liable for Carter's negligence. Mar-Jac primarily relied on Carter's deposition testimony to support its motion. Mar-Jac attached the crash reports and Carter's petition to controvert, as well as Carter's deposition.

¶7.     The Plaintiffs filed their response to Mar-Jac's motion. Shortly thereafter, the trial court heard arguments on both parties' motions. The Plaintiffs argued that Carter "was told by his supervisors and his superiors at work that he was in charge of making sure these women got to work on time. That was his job." Counsel for Plaintiffs further argued that the deposition testimony reflected that Mar-Jac had told Carter, "You're in charge of bringing these girls to work." Mar-Jac responded that Carter had testified that he was not expected or required by Mar-Jac to bring Love and Wilks to work. The trial court ruled from the bench that he was going to deny both Mar-Jac's motion for summary judgment and the Plaintiffs' motion for partial summary judgment.

¶8.     On October 12, 2017, the trial court issued a written order finding that a genuine dispute of material fact existed and that both parties' motions should be denied. This Court granted Mar-Jac's petition for permission to appeal on April 19, 2018. Both parties filed briefs. An *amicus curiae* brief in support of Mar-Jac's position also was filed by the Business & Industry Political Education Committee, which was joined by thirty-six other companies.

4

**ISSUE**

¶9. The only issue before the Court is whether the trial court erred in denying Mar-Jac's motion for summary judgment

**STANDARD OF REVIEW**

¶10. "This Court reviews *de novo* a trial court's grant or denial of summary judgment." ***Commercial Bank v. Hearn***, 923 So. 2d 202, 204 (Miss. 2006) (citing ***Brooks v. Roberts***, 882 So. 2d 229, 231 (Miss. 2004)). "The evidence must be viewed in the light most favorable to the nonmoving party." ***Sanderson Farms, Inc. v. McCullough***, 212 So. 3d 69, 74 (Miss. 2017) (citing ***Simpson v. Boyd***, 880 So. 2d 1047, 1050 (Miss. 2004)). "However, that party's claim must be supported by more than a mere scintilla of colorable evidence; it must be evidence upon which a fair-minded jury could return a favorable verdict." ***Id.*** (citing ***Anderson v. Liberty Lobby, Inc.***, 447 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).

**DISCUSSION**

¶11. The Plaintiffs' claims against Mar-Jac are based solely on the theory of *respondeat superior*. "Since the mid-19th century, this Court has recognized the doctrine of *respondeat superior*[,] which imputes an employee's negligence to the employer." ***Hearn***, 923 So. 2d at 204. "However, for just as long, this Court has limited this vicarious liability to acts of the employee 'performed within the scope of the authority conferred.'" ***Id.*** (quoting ***Steamboat General Worth v. Hopkins***, 30 Miss. 703, 711 (Miss. 1856).

> The doctrine of respondeat superior has its basis in the fact that the employer
> has the right to supervise and direct the performance of the work by his

employe[e] in all its details, and this right carries with it the correlative obligation to see to it that no torts shall be committed by the employe[e] in the course of the performance of the character of work which the employe[e] was appointed to do.

*White's Lumber & Supply Co. v. Collins*, 186 Miss. 659, 191 So. 105, 107 (Miss. 1939).

¶12. This Court has cited with approval the Second Restatement of Agency, which provides,

> (1) Conduct of a servant is within the scope of employment if, *but only if*:
>
> > (a) It is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> >
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Marter v. Scott*, 514 So. 2d 1240, 1242-43 (Miss. 1987) (emphasis added) (quoting Restatement (Second) of Agency § 228 (Am. Law Inst. 1958)).

¶13. Mar-Jac argues that Carter was not acting in the course and scope of his employment at the time of the accident. Mar-Jac asserts that Carter's act of transporting Wilks and Love was not "of the kind" that he was employed to perform, was not done in the "authorized time and space limits," and was not "to serve" Mar-Jac. *Marter*, 514 So. 2d at 1242-43 (quoting Restatement (Second) of Agency § 228 (Am. Law Inst. 1958)).

6

¶14.    Based on the evidence presented, one conversation between Carter and Leo Barnes, a Mar-Jac supervisor, forms the basis of the Plaintiffs' claims against Mar-Jac.  The Plaintiffs assert that Mar-Jac, through Barnes, instructed Carter to provide transportation to Wilks and Love as part of his job duties, relying on isolated portions of Carter's and Barnes's testimony to support their claims.  However, taken as a whole, the testimony is clear that Carter was not required to drive Wilks and Love to work.  Carter repeatedly testified that he was not expected to bring the women to work as part of his job responsibilities at Mar-Jac. During the deposition taken in Carter's workers' compensation case, Carter testified about his conversation with Barnes as follows:

> Q.    Had anybody at Mar-Jac asked you to bring those two ladies to work?
> A.    Yes. Leo – Leo did.
> Q.    Leo?
> A.    Leo. Leo Barnes.
> Q.    Tell me about that conversation.
> A.    Well, I asked did he have an opening. He said, Yes. And I said – he said, Who you got? I said, I got two young ladies that need a job.  He said, Will they work? I said, Yeah, they'll work.  *I said, I'm gonna bring 'em to work.*  Bring 'em up – he said, Bring 'em up here, and I'll talk to them, and I'll hire them.
> Q.    Did he tell you to bring the ladies to work?
> A.    Yes.
> Q.    Were you paid to bring the ladies –
> A.    No.
>
> . . . .
>
> Q.    Did Mar-Jac pay you for bringing them to work?
> A.    No. They didn't – I paid my own self to go in to work.  No.  Didn't nobody pay me nothing.
> A.    Did they pay your gas for bringing them to work?
> A.    Paid – no. I paid my own gas.
>
> . . . .

7

Q. All right. You just told me what – part of what Leo Barnes said. Did he say anything else?

A. No. That's all – all he said to me. Bring them up there, he'll hire them. He said, Will they work? I said, Yeah, they'll work. Just bring them up there and hire – interview them, and hire them. And that's what I done.

. . . .

Q. *And nobody had told you that you had to bring them as a condition of your employment?*

A. *No.*

Q. *No –*

A. *He didn't – he didn't tell me to bring them. I asked him if he'd hire them, he said, Yes. Bring them down. Then he asked me will they work? I said, Yes, they'll work. And I brought them to work.*

. . . .

Q. *Did Mr. Barnes or anyone else say that you had to provide transportation to these ladies –*

A. *No.*

Q. Nobody said that, did they?

A. No. All he done, just told me to bring –

. . . .

(Emphasis added.)

¶15. Carter again testified about this same conversation during the deposition taken in this

case. Carter testified as follows:

Q. Your testimony has been that somebody, Leo you said, asked you to bring Mr. And Ms. Wilks [sic] to Mar-Jac. Is that right?

A. Yes.

. . . .

Q. So you go to Leo, and Leo says he does have job openings, doesn't he?

A. Yes.

. . . .

8

Q. Mr. Carter, my question is, Leo asked you, when you said you had two people that wanted these jobs that he had, he asked you if they could get to work.

. . . .

A. Yes. I told him yes.

. . . .

Q. *Leo Barnes –*
[objection]
Q. *– never told you that as part of your job, you were expected and required by Mar-Jac to bring Ms. Love and Ms. Wilks to work–*
[objection]
Q. *– did he?*
[objection]
Q. *Yes or no –*
A. *No.*

. . . .

A. He told me to bring – he told me to bring them, he gone hire them.
First thing he – he asked me – he asked me, "Will they work?"
I said "Yeah."
He said, "Bring them on down here." He said, "I'll hire them."

. . . .

Q. Yeah. Now, Mar-Jac did not pay you any money –
A. No.
Q. – for bringing them to work, did they?
[objection]
A. No.
[objection]
Q. And nobody at Mar-Jac said you were going to get fired if you didn't bring them to work, did they?
[objection]
A. No.
Q. And nobody said that you would be punished or written up for any violations of any of your job responsibilities if you didn't bring Ms. Wilks and Ms. Love to work, did they?

A. No.

. . . .

Q. So there were going to be zero repercussions to you if you didn't bring Ms. Wilks and Ms. Love to work –
[objections]

Q – as far as Mar-Jac's concerned?

A. Yes.

(Emphasis added.)

¶16. Leo Barnes also testified about the conversation he had with Carter as follows:

Q. All right. Now, the conversation that you had with [Carter] about bringing the two girls to work happened the day before they started, correct?

A. Yeah. I mean, he – not bring them to work. All we [sic] said is they need jobs. We didn't talk about – I just said, Can they get to work? That was all that was said. There was no conversation about it. He just said they needed a job.

Q. Did you tell him to bring them up there tomorrow?

A. Yeah, to start work. I said, I got two spots. If they can be at work in the morning, they will start. Bring boots.

Q. All right. So on September the 8th, you and [Carter] had a discussion where you said, If they can be here in the morning, bring them on?

A. Yes, sir.

Q. Okay. *Did you know that [Carter] was going to be the one bringing them?*

A. *No, because, I mean, it doesn't matter. Long as they get to work, I'm happy. I don't care how they get to work.*

Q. Okay.

A. Long as they gonna get there, they gonna get there.

Q. Okay.

A. That's all I took out of it.

Q. It doesn't do any good for – for Mar-Jac to have employees that doesn't show up to work, right?

A. You're right.

Q. They need to show up, right?

A. Have to show up.

Q. *And – and did you know that if [Carter] didn't bring them, that they didn't have another way to get there?*

A. *It didn't matter.* They said they would get there. That's – that's on them. That's between him – them and [Carter]. All I said, if they get there. If they're not there, they're termed. That's all I deal with.

Q. Did you know that [Carter] brought them on September the 9th?

A. I mean –

Q. Did you – did you know they rode with him?

A. Probably – yes, because he said he would bring them because they stay with him, so, yeah.

Q. Did you know that he brought them to work every day after that?

A. But what that got to do with it? I got people that bring people to work everyday. It's not company policy. If you're not at work, you're not at work. Work start at 8:00, time o'clock, 8:00. That's all that matter. Anything from 8 and before, it doesn't got nothing to do with Mar-Jac.

. . . .

(Emphasis added.)

¶17. The testimony is undisputed that Barnes told Carter to "bring [Wilks and Love] on down here" or to "bring [Wilks and Love] up here." However, Carter's and Barnes's depositions, viewed as a whole, provide the context in which Barnes's statement was made. Carter had approached Barnes about hiring Wilks and Love. Barnes asked Carter if the two women would be able to get to work. Carter told Barnes that he would "bring [Wilks and Love] to work." Barnes then responded to Carter's request to bring Wilks and Love to Mar-Jac by telling Carter to "bring them on down here" or "bring them up here." No dispute exists that Barnes made this statement. But this statement, without more, is insufficient to impute Carter's negligence to Mar-Jac, because Carter repeatedly testified that he was not required by Mar-Jac to bring Wilks and Love to work. Carter testified that neither Barnes nor any other Mar-Jac supervisor told Carter that he "had to transport" Wilks and Love to work. Further, Barnes testified that it did not matter how Wilks and Love got to work and

11

that the employee's responsibility—not Mar-Jac's—is to present himself or herself to work. It is therefore undisputed that Carter was not required as part of his job responsibilities as a jack driver at Mar-Jac to provide Wilks's and Love's transportation to work.

¶18. This Court's previous decision in *Hearn* is instructive. There, an officer of a bank drove a United Way pledge-solicitation package to a local business during banking hours. *Hearn*, 923 So. 2d at 203. The bank employee hit another vehicle, killing an infant child. *Id.* A lawsuit was filed against the bank, and the bank sought summary judgment, claiming that the employee was not acting within the scope of his employment at the time of the accident. *Id.* at 204. The plaintiffs argued that the bank benefitted from the employee's charitable acts, that the accident was within the "spatial and time limits of his employment," and that it was of the same general nature as the conduct authorized or incidental to his employment. *Id.* at 206. Quoting the Second Restatement of Agency, this Court rejected the plaintiffs' argument, finding that the plaintiffs had not submitted any proof that the employee was "employed to perform" that kind of conduct. *Id.* at 209 (quoting *Marter*, 514 So. 2d at 1242-43 (quoting Restatement (Second) of Agency § 228 (1958))). Further, the Court found that, even though "there may be substantial evidence that the Bank encouraged [the employee's] participation in charitable activities and benefitted therefrom, far more is required to impute liability to the Bank under the doctrine of *respondeat superior*." *Id.* at 208-09. Thus, the Court granted summary judgment in favor of the bank, because the plaintiffs did not show that the employee's conduct was the kind of work that he had been employed by the bank to perform. *Id.* at 209.

¶19. Applying the elements of the Second Restatement of Agency, Section 228, the transportation of Wilks and Love was not "of the kind" that Carter was employed to perform. *Marter*, 514 So. 2d at 1242-43. Carter was employed as a jack driver,[1] he had no other job responsibilities, and he was not paid to transport his coworkers. Although the dissent suggests that this was only a "contention," the deposition testimony is undisputed that Carter was not expected to or required to transport Wilks and Love to Mar-Jac as part of his job responsibilities. Second, Carter's driving to work did not occur within the "authorized time and space limits." *Id.* Carter was approximately thirty miles away from Mar-Jac at the time of the accident. Carter was not "on the clock," nor was he compensated for his travel expenses. As to the third element, the Plaintiffs vigorously assert that Carter drove Wilks and Love for the purpose of benefitting Mar-Jac. The Plaintiffs assert that Carter's transporting Wilks and Love "ensured Mar-Jac had workers available for its mandatory and necessary shifts—that chicken is not going to de-bone itself!" Even if it were true that Carter transported Wilks and Love, at least in part, to benefit Mar-Jac, "this does not of itself constitute [Carter] as an employee of [Mar-Jac] at the particular time of the accident." *Id.* at 1243. As this Court held in *Hearn*, "we look to the act committed by the employee, rather than some indirect benefit the employer may have received from a specific act not part of the duties of employment." *Hearn*, 923 So. 2d at 208. Carter's "act" was driving to work. This Court has long held that "it is the business of the employee to present himself at the place of

---

[1] According to Carter's testimony, a "jack driver" is responsible for driving and lifting a pallet jack machine to transport chicken products from the cooler to employees working on the line and to return the chicken to the cooler after processing.

13

employment, and the relation of master and servant does not exist while he is going between his home and his place of employment." ***Brown v. Bond***, 190 Miss. 774, 1 So. 2d 794, 799 (Miss. 1941).

¶20. The Plaintiffs contend that unambiguous deposition and affidavit testimony establishes that Carter was specially and exclusively instructed to transport Wilks and Love to Mar-Jac. To defeat Mar-Jac's motion for summary judgment, the Plaintiffs rely on Carter's deposition testimony (which refutes their position) and on two affidavits executed by Carter and Patricia Love. Carter's affidavit consists of five paragraphs, which state the following:

> My name is Senah Carter and I am over the age of 21. I am competent and authorized to make this Affidavit and the matters contained herein are within my personal knowledge and are true and correct. I am a resident of Prentiss, Mississippi.

> I am currently an employee of Mar-Jac, and work at the poultry plant in Hattiesburg, Mississippi.

> I travel by car to work everyday and typically transported both Keannie Love and Lishanay Wilks, who are also employees of Mar-Jac. This transportation was provided at the direction and instruction of my supervisors/superiors at Mar-Jac. I provided rides to and from work basically every day for Keannie Love and Lishanay Wilks as Love and Wilks did not have a vehicle to provide themselves transportation to work. It is my belief that transporting Keannie Love and Lishanay Wilks was beneficial to Mar-Jac.

> The purpose of this transportation was to ensure Mar-Jac employees had transportation to and from work, and I considered these rides as part of my normal work assignment.

> On the morning of September 22, 2015, while traveling to Mar-Jac's poultry plant in Hattiesburg for work with both Love and Wilks as my passengers, I was involved in a car crash that resulted in the deaths of both Love and Wilks.

14

Carter's deposition testimony directly contradicts his affidavit, because Carter specifically testified that he was never told that he was required by Mar-Jac to bring Wilks and Love to work. Further, Carter was questioned about this affidavit during his deposition and testified that he had received this affidavit in the mail and had not spoken to anyone about the content of the affidavit before receiving it. Carter also testified that his deposition testimony was *more* accurate than the affidavit.

¶21. "Although the court must resolve all factual inferences in favor of the nonmovant, the nonmovant cannot manufacture a disputed material fact where none exists." *Foldes v. Hancock Bank*, 554 So. 2d 319, 321 (Miss. 1989) (quoting *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984)). "Thus, the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." *Id.* (quoting *Albertson*, 749 F.2d at 228). Carter discredited the verity of his own affidavit during his deposition; thus, the Plaintiffs cannot defeat Mar-Jac's motion for summary judgment based on Carter's affidavit.

¶22. Patricia Love's affidavit provided the following:

> My name is Patricia Love. I am over the age of 21. I am competent and authorized to make this Affidavit and the matters contained herein are within my personal knowledge and are true and correct. I am a resident of Prentiss, Mississippi.
>
> I am a [sic] the mother of Keannie Love, deceased, who was an employee of Mar-Jac and worked at the Mar-Jac poultry plant in Hattiesburg, Mississippi. When Keannie began working for Mar-Jac, Senah Carter assured me on multiple occasions that he would provide transportation to Keannie Love from our home to work. Senah reassured me that he would take care of the transportation because Mar-Jac had told him to do it as a part of his job duties.

15

Keannie's friend, Lishanay Wilks, also told me that Senah Carter was providing her transportation at the request of Mar-Jac. Senah personally confirmed this to me and stated one of his supervisors told him to make sure Keannie and Lishanay got to work.

Senah provided rides to and from work for Keannie Love and Lishanay Wilks basically every day because Keannie Love and Lishanay Wilks did not have a vehicle to get them to work.

Keannie and Senah both told me that Mar-Jac benefitted from this ride share program so they could get to work on time, and did not have to worry about finding a ride to work.

On the morning on September 22, 2015, while traveling to Mar-Jac's poultry plant in Hattiesburg for work, Senah, Keannie, and Lishanay were involved in a car crash that resulted in the deaths of Keannie Love and Lishanay Wilks.

Patricia Love's affidavit is based on what Carter, Love, or Wilks told her about what Mar-Jac allegedly told them. Thus, Patricia's statements about Mar-Jac are hearsay[2] and are not based on personal knowledge. "[S]ummary-judgment evidence must be admissible at trial." ***Ill. Cent. R.R. Co. v. Jackson***, 179 So. 3d 1037, 1043 (Miss. 2015) (citing ***Trustmark Nat'l Bank v. Meador***, 81 So. 3d 1112, 1118 (Miss. 2012)). "[H]earsay statements that would not be admissible at trial are incompetent to support or oppose summary judgment." ***Jackson***, 179 So. 3d at 1043 (citing ***Harris ex rel. Harris v. Pontotoc Cty. Sch. Dist.***, 635 F.3d 685, 692 (5th Cir. 2011)). Patricia's affidavit fails to satisfy Mississippi Rule of Civil Procedure 56(e), which requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." Miss. R.

---

[2] Hearsay is a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted. Miss. R. Evid. 801(c).

16

Civ. P. 56(e). Like Carter's affidavit, Patricia's affidavit is insufficient to defeat Mar-Jac's motion for summary judgment.

## CONCLUSION

¶23. Based on the evidence presented, the trial court erred in denying Mar-Jac's motion for summary judgment. The testimony is undisputed that Carter was not acting in the course and scope of his employment with Mar-Jac when the accident occurred. The Plaintiffs have failed to submit admissible proof to dispute that fact. We reverse and render summary judgment in favor of Mar-Jac.

¶24. **REVERSED AND RENDERED.**

**COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶25. I dissent from the majority's rendering of summary judgment in favor of Mar-Jac Poultry MS, LLC (Mar-Jac). Patricia Love and LaShawn Miller (collectively, the Plaintiffs) presented sufficient evidence to create material issues of fact as to whether Senah Carter was operating within the course and scope of his employment with Mar-Jac when he was transporting two of Mar-Jac's employees to work. Accordingly, a jury, not this Court, should decide whether Mar-Jac should be held liable under the doctrine of *respondeat superior*.

¶26. On September 22, 2015, Senah Carter, an employee of Mar-Jac, was transporting Lishanay Wilks and Keannie Love, also employees of Mar-Jac, to work. Carter rear-ended a school bus, resulting in the deaths of Wilks and Love. The Plaintiffs filed claims against

17

Mar-Jac under the doctrine of *respondeat superior*, alleging that Carter had been on a special mission for Mar-Jac at the time of the accident. The trial court denied Mar-Jac's motion for summary judgment, finding that the issue was one for the jury.

¶27.    Mississippi Rule of Civil Procedure 56 mandates that summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56. "The burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant is given the benefit of the doubt." ***Anderson v. LaVere***, 895 So. 2d 828, 832 (Miss. 2004) (citing ***McCullough v. Cook***, 679 So. 2d 627, 630 (Miss. 1996)). Because "[a] motion for summary judgment is not a substitute for trial of disputed fact issues, the court may only determine whether there are issues to be tried." ***Id.*** (citing ***Dennis v. Searle***, 457 So. 2d 941, 944 (Miss. 1984), *overruled on other grounds by* ***Thornhill v. Sys. Fuels, Inc.***, 523 So. 2d 983 (Miss. 1988)). This Court conducts a de novo review of the granting or denial of summary judgment. ***Id.***

¶28.    "Under the respondent superior doctrine, 'one who acts through another is in law himself the actor.' That is, '[i]f B while acting on A's behalf commits a tort, A may be liable.'" ***Gulledge v. Shaw***, 880 So. 2d 288, 295 (Miss. 2004) (quoting ***Fruchter v. Lynch Oil Co.***, 522 So. 2d 195, 199 (Miss. 1988)). As this Court stated,

> The inquiry is not whether the act in question, in any case, was done, so far as time is concerned, while the servant was engaged in the master's business, nor as to mode or manner of doing it,—whether in doing the act he uses the appliances of the master,—but whether, from the nature of the act itself as

18

actually done, it was an act done in the master's business, or wholly disconnected therefrom by the servant, not as servant, but as an individual on his own account.

*Id.* (emphasis omitted) (quoting *Holliday v. Pizza Inn, Inc.*, 659 So. 2d 860, 864 (Miss. 1995)). The *Gulledge* Court went on to specify that

> In determining whether a particular act is committed by a servant within the scope of his employment, the decisive question is not whether the servant was acting in accordance with the instructions of the master, *but, was he at the time doing any act in furtherance of his masters' business?* If a servant, having completed his duty to his master, then proceeds to prosecute some private purpose of his own, the master is not liable; but if the servant, while engaged about his master's business, merely deviates from the direct line of duty to accomplish some personal end, the master's responsibility may be suspended, but it is re-established when the servant resumes his duty.

*Id.* (emphasis in original) (quoting *Holliday*, 659 So. 2d at 864-65).

¶29. Generally, employers are not liable for injuries received by employees off of the premises of the employer and while employees are going to or returning from their work. *Wallace v. Copiah Cty. Lumber Co.*, 223 Miss. 90, 98, 77 So. 2d 316, 317 (1955) (citing 1 Larson's Workmen's Compensation Law at 194). However, this Court has established exceptions to the general rule when the employee is performing an act that he has been authorized to do and that directly benefits the employer. As the evidence shows, Carter was not merely traveling to work that morning; he was transporting two additional Mar-Jac employees. I conclude that the facts presented in this case establish genuine issues of fact as to whether Mar-Jac should be held responsible under the theory of *respondeat superior*.

¶30. I agree with the majority's contention that the *Commercial Bank v. Hearn*, 923 So. 2d 202 (Miss. 2006), decision is instructive. However, I would find *Hearn* to be beneficial

19

in affirming the trial court's denial of summary judgment. In **Hearn**, an employee of Commercial Bank left the bank during work hours on a personal errand to deliver a package to United Way. **Id.** at 205. The employee did not deliver the package for the benefit of Commercial Bank, although it was admitted that Commercial Bank might indirectly have benefitted from the employee's activities. **Id.** at 206. However, this Court stated that an indirect benefit was not an appropriate test for *respondeat superior*. **Id.** The **Hearn** Court found **Gulledge** to be controlling, and it held that the pertinent question was "whether, from the *nature of the act itself* as actually done, it was *an act* done in the master's business, or wholly disconnected therefrom by the servant. . . ." **Id.** at 207 (emphasis in original) (quoting **Gulledge**, 880 So. 2d at 295). The Court went on to state that whether the employee had been authorized to perform the act was an important factor. **Id.** at 208.

¶31.    Here, unlike in **Hearn**, Carter's transportation of two Mar-Jac employees to work certainly did directly benefit Mar-Jac. Leo Barnes, a supervisor at Mar-Jac, hired Love and Wilks to work in his department. Barnes testified that he needed Love and Wilks to work at Mar-Jac. Therefore, Carter's transportation of two Mar-Jac employees whom Mar-Jac needed to work directly benefitted Mar-Jac. The Plaintiffs also presented evidence that, not only had Carter been authorized to transport Love and Wilks to work, but that he was encouraged to provide them transportation by one of his supervisors.

¶32.    The majority contends that the transportation of Wilks and Love was not "of the kind" that Carter was employed to perform. However, this Court has used the term "authorized" as coterminous with "employed to perform" in the *respondeat superior* context. In **Marter**

20

***v. Scott***, 514 So. 2d 1240, 1242-43 (Miss. 1987), this Court quoted Section 228 of the Second Restatement of Agency, which provides,

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> > (b) it occurs substantially within the authorized time and space limits;
> > (c) it is actuated, at least in part, by a purpose to serve the master, and
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind *from that authorized*, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

***Hearn***, 923 So. 2d at 208 (emphasis added) (quoting Restatement (Second) of Agency § 228 (Am. Law Inst. 1958)). And the ***Hearn*** Court stated that

> The comment to § 228 explains that "not all physical acts *of the kind authorized* performed within the time and at the place of service are within the scope of employment, since only those which the servant does in some part for the purpose of giving service to the master are included."

***Hearn***, 923 So. 2d at 208 (emphasis added) (quoting Restatement (Second) of Agency § 228 cmt. (Am. Law Inst. 1958)); *see **Adams v. Cinemark USA, Inc.***, 831 So. 2d 1156, 1159 (Miss. 2002) (emphasis added) ("It is obvious that Thomas's tortious act of assaulting Adams *was not authorized* or in furtherance of Cinemark's business."), *superseded by rule as recognized in **Tunica Cty. v. Town of Tunica***, 227 So. 3d 1007, 1026-27 (Miss. 2017).

¶33.   Carter submitted an affidavit stating that he typically transported both Love and Wilks to work. He stated that

> This transportation was provided at the direction and instruction of my supervisors/superiors at Mar-Jac. I provided rides to and from work basically every day for Keannie Love and Lishanay Wilks as Love and Wilks did not

21

have a vehicle to provide themselves transportation to work. It is my belief that transporting Keannie Love and Lishanay Wilks was beneficial to Mar-Jac. . . . I considered these rides as part of my normal work assignment.

Patricia Love, Keannie Love's mother, also submitted an affidavit stating that

When Keannie began working for Mar-Jac, Senah Carter assured me on multiple occasions that he would provide transportation to Keannie Love from our home to work. Senah reassured me that he would take care of the transportation because Mar-Jac had told him to do it as a part of his job duties. Keannie's friend, Lishanay Wilks, also told me that Senah Carter was providing her transportation at the request of Mar-Jac. Senah personally confirmed this to me and stated one of his supervisors told him to make sure Keannie and Lishanay got to work.

Carter was not acting as an individual on his own account in this case. Instead, Carter was authorized and even encouraged to bring two Mar-Jac employees to work.

¶34. Additionally, I disagree with the majority's contention that Carter was not expected to bring Love and Wilks to work. Carter testified that one of his supervisors, Barnes, had asked Carter to bring the two girls to Mar-Jac so they could work. Barnes confirmed that he was one of Carter's supervisors. Carter's deposition testimony reads as follows:

Q: Had anybody at Mar-Jac asked you to bring those two ladies to work?
A: Yes. Leo – Leo did.
Q: Leo?
A: Leo. Leo Barnes.
Q: Tell me about that conversation.
A: Well, I asked did he have an opening. He said, Yes. And I said – he said, Who you got? I said, I got two young ladies that need a job. He said, Will they work? I said, Yeah, they'll work. I said, I'm gonna bring 'em to work. Bring 'em up – he said, Bring 'em up here, and I'll talk to them, and I'll hire them.
Q: Did he tell you to bring the ladies to work?
A: Yes.
    . . . .
Q: I want to know everything Leo Barnes said to you about bringing those two ladies to work.

22

A:     Told me bring them – he told me, bring them and get them interviewed, and said he'd hire them, and that's what he did.

¶35.   In a separate deposition, Carter again stated that he wasn't being paid to bring Love and Wilks but that he was "asked to bring them," and he stated further that Mar-Jac needed workers. Carter testified as follows:

Q:     And he asked you to bring those girls to Mar-Jac so they could work for Mar-Jac. Correct?
       OTT:  Object to the form.
A:     Yeah.
Q:     Because he had positions to fill in his line. Correct?
       OTT:  Object to the form.
A:     Yes.
Q:     And he knew they had no other way to get to work except through you. Correct?
       OTT:  Object to the form.
A:     Yes.
Q:     After Leo told you to bring the girls to work, you told him you would get the girls to work. Right?
       OTT: Object to form.
A:     Yes.
Q:     And he expected you to get the girls to work. Correct?
       OTT: Object to form.
A:     Yes.
Q:     And if they missed work, Leo would come and ask you where the girls were at. Right?
       OTT: Object to form.
A:     Yes, or either like – like if I go back down, say, "Where the girls at," he say, "They went home." Say, "One of them was sick," like that. He say, "They coming back tomorrow," like that.
Q:     And he'd come and talk to you about it. Right?
A:     Yeah.

¶36.   Clearly there are issues to be tried in this case, and Mar-Jac is not entitled to a judgment as a matter of law. The test in *Gulledge* is whether "from the nature of the act itself as actually done, it was an act done in the master's business, or wholly disconnected

23

therefrom by the servant. . . ." ***Hearn***, 923 So. 2d at 207 (emphasis omitted) (quoting

***Gulledge***, 880 So. 2d at 295). Transporting two Mar-Jac employees to work was not wholly

disconnected from Mar-Jac's business. Instead, it was done in furtherance of Mar-Jac's

business. Because the Plaintiffs have provided sufficient evidence that Carter was bringing

Wilks and Love to work to directly benefit Mar-Jac and at Mar-Jac's encouragement and

authorization, I would affirm the trial court's denial of summary judgment.

¶37.    Moreover, in the workers' compensation context, there is also a recognized exception

to the coming-and-going rule—when the employee was involved in a special mission or

errand for his employer. *See **Miller Transporters, Inc. v. Seay's Dependents***, 350 So. 2d

689, 691 (Miss. 1977). In ***Duke ex rel. Duke v. Parker Hannifin Corp.***, 925 So. 2d 893, 897

(Miss. Ct. App. 2005), the Mississippi Court of Appeals found sufficient facts to determine

that the employee, Laura Duke, had been on a special mission for her employer at the time

of her death. There, shortly after Duke had arrived at work, she was notified that the building

was being evacuated because of a fire. ***Id.*** at 894. Duke was instructed to leave the area and

to call her supervisor later that morning to determine when to return to the facility. ***Id.*** Duke

drove to an independent contractor's nearby home office. ***Id.*** at 894-95. Later that morning,

Duke's supervisor informed her to return to work. ***Id.*** On the way back, Duke was involved

in a fatal, one-vehicle accident. ***Id.*** at 895. The Court of Appeals held that because Duke "had

been in possession of some computer backup tapes and a laptop computer" and because Duke

had not been released from work, Duke had been on a special mission. ***Id.*** at 897.

24

¶38. Outside jurisdictions also have found that a special mission occurred when the employee had been transporting work product. The District Court of Appeal of Florida, First District, also found that an employee was engaged in the performance of work for her employer and was furthering the employer's interest when the employer directed the employee to drive to a coworker's home and transport her to work. *Alexander & Alexander Fashions v. Ortega*, 562 So. 2d 418 (Fla. Dist. Ct. App. 1990). The Florida court quoted Section 27.00 of Larson's treatise, *The Law of Workmen's Compensation*, stating "[a]n act outside an employee's regular duties which is undertaken in good faith to advance the employer's interests, whether or not the employee's own assigned work is thereby furthered, is within the course of employment." *Id.* at 419 (quoting Larson, *The Law of Workmen's Compensation* § 27.00 (1985)).

¶39. In *Sun Papers, Inc. v. Jerrell*, 411 So. 2d 790 (Ala. Civ. App. 1981), an Alabama court found that sufficient evidence had existed to support a finding that an employee's accident on the way to work arose out of and in the course of his employment. The court found probative that "[t]he wife testified that just before her husband left the house on Saturday morning, he said that he was going to the office to deliver some material he had picked up at a high school the day before." *Id.* at 793.

¶40. Although this lawsuit does not involve workers' compensation, other courts have applied the special-mission exception to the coming-and-going rule in a tort context. *See Godwin ex rel. Godwin v. United States*, No. 3:14cv391-DPJ-FKB, 2015 WL 4644711, at *4 (S.D. Miss. 2015) (internal quotation marks omitted) (recognizing an exception to the

"going and coming rule" as "when the employee is on a special mission or errand for his employer" (quoting *Duke*, 925 So. 2d at 893));[3] ***Chevron, U.S.A., Inc. v. Lee***, 847 S.W.2d 354, 356 (Tex. App. 1993) ("However, an exception to the general rule exists where an employee has undertaken a special mission at the direction of his employer or is otherwise performing a service in furtherance of the employer's business with the express or implied approval of the employer.") (citing ***Gebert v. Clifton***, 553 S.W.2d 230, 232 (Tex. Civ. App. 1977))); ***Kephart v. Genuity, Inc.***, 38 Cal. Rptr. 3d 845, 853 (Cal. Ct. App. 2006) ("An employee who is going to work, or coming from work, is within the scope of employment if the employee is on a special errand, either as part of his or her regular duties or at a specific order or request of the employer.") (citing ***Tognazzini v. San Luis Coastal Unified Sch. Dist.***, 103 Cal. Rptr. 2d 790, 790 (Cal. Ct. App. 2001))).[4]

¶41.    Carter was not merely transporting work product that morning. Instead, he was transporting two needed employees to work at the encouragement of his employer. Summary judgment is appropriate only when the evidence reveals *no* genuine dispute regarding any material fact. I would find that the Plaintiffs presented sufficient evidence to create questions

---

[3]In the ***Godwin*** case, the district court judge also found probative that the employee's supervisor had *authorized* the special mission. *Id.* at *4.

[4]*See also* ***Mastec N. Am., Inc. v. Sandford***, 765 S.E.2d 420 (Ga. Ct. App. 2014); ***Carter v. Reynolds***, 815 A.2d 460, 467 (N.J. 2003) ("There are, however, exceptions to the going and coming rule. Those exceptions are also rooted in workers' compensation law but have been engrafted onto tort law."); ***Skinner v. Braum's Ice Cream Store***, 890 P.2d 922 (Okla. 1995); and ***Alsay-Pippin Corp. v. Lumert***, 400 So. 2d 834, 835-36 (Fla. Dist. Ct. App. 1981) ("Nor are we convinced that there was an erroneous application of Workmen's Compensation law pertaining to scope of authority rather than an application of common law principles of respondeat superior.").

of fact about whether Carter was bringing Wilks and Love to work for the direct benefit of Mar-Jac, whether Carter was not only authorized to bring the girls to work but was expected to, whether Mar-Jac needed workers, and whether Carter was acting in the scope and course of his employment when he was involved in the accident. I would affirm the trial court's denial of summary judgment and would remand this case for a trial on the merits. Accordingly, I dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**